UNITED STATES DISTRICT COURT
EASTERN DIVISION OF NORTH CAROLINA
WESTERN DIVISION

NO: 5:07-CV-235-F

PEGGY PLEDGER, )
)
Plaintiff, )
)
v. )
) O R D E R
MAYVIEW CONVALESCENT HOME, )
INC., a.k.a. MAYVIEW )
CONVALESCENT CENTER, )
)
Defendant. )

This matter is before the court on Defendant's Motion for Summary Judgment [DE-15] on

Plaintiff's claims that she has been unlawfully discriminated and retaliated against in her

employment on the basis of her age, religion and age. The motion has been fully briefed, and is

therefore ripe for ruling.

## I. STATEMENT OF THE CASE

On June 22, 2007, Plaintiff Peggy Pledger ("Pledger") filed a Complaint [DE-1] in this

court against her employer Mayview Convalescent Center ("Mayview") containing various

claims arising out of her employment. Specifically, Pledger alleged that (1) she has been

discriminated against on the basis of her race, age and religion and that she has been subjected to

disparate treatment in the terms and conditions of her employment in violation of 42 U.S.C. §

2000e ("Title VII"), the Age Discrimination in Employment Act ("ADEA") and 42 U.S.C. §

1981, (2) she has been retaliated against by her employer in violation of Title VII, the ADEA and

42 U.S.C. § 1981 and (3) she has been subjected to negligent and intentional infliction of

emotional distress. On May 14, 2008, Pledger filed a Stipulation of Dismissal [DE-14]

withdrawing her claims of negligent and intentional infliction of emotional distress. Pledger's claims of unlawful discrimination and retaliation remain as the focus of this action, and on June 6, 2008, Mayview filed a Motion for Summary Judgment [DE-15] as to these remaining claims. For the reasons set forth below, Mayview's Motion for Summary Judgment [DE-15] is ALLOWED.

## II. STATEMENT OF FACTS

Pledger is African-American and was forty-nine years old at the time she was hired by Mayview. She is a member of the Jehovah's Witness faith.

### A. Mayview

Mayview operates a skilled nursing facility in Raleigh, North Carolina. Travis Tomlinson ("Tomlinson") is the administrator and is responsible for the overall management of the facility. Lynn Haynes ("Haynes") is the Director of Nursing and is responsible for the supervision of nursing care and nursing personnel at Mayview. Janice Barlow ("Barlow") is the Personnel Director and shares responsibility with the department heads for the hiring and firing of employees. Barlow is also responsible for the management of employee benefits and is the custodian of Mayview employee records.

The nursing department at Mayview is comprised of approximately 100-110 nursing employees who are responsible for approximately 120-140 facility residents at the facility. The non-management employees within the nursing department at Mayview include registered nurses ("RN"), licensed practical nurses ("LPN") and certified nursing assistants ("CNA"). The nursing department is comprised of nursing Stations Two, Three and Four, and each station corresponds to a resident hall within the facility. Each nursing station cares for approximately 40-50 residents

2

and is staffed with a CNA and either a RN or LPN. In addition, some nurses referred to as "floaters" operate unattached to a specific nursing station. Station Two is usually the busiest station, as Hall Two has the greatest number of turnover in admissions and provides care for residents who undergo therapy. The nursing department is divided further into three work shifts: first shift operates from 7 a.m.-3 p.m.; second shift operates from 3 p.m. - 11 p.m.; and third shift operates from 11 p.m. - 7 a.m.

### 1. Scheduling at Mayview

As Director of Nursing, Haynes is responsible for creating the work schedule for each nurse. The work schedule is created four weeks in advance. In creating the work schedule, Haynes considers facility staffing needs and which employees have told her that they are unavailable to work. In the event an employee wishes to change her shift schedule, the employee must provide written notice to Haynes. Haynes prioritizes the work schedule by first scheduling full-time employees then part-time employees.

### 2. Mayview's employee handbook

Mayview's employee handbook contains an anti-discrimination policy specifically describing a policy of fairness and impartiality with respect to its treatment of employees and job applicants with regard to age, race and religion, and other protected categories. The policy states that all personnel actions will be administered without regard to these characteristics. The handbook provides further that employees are encouraged to bring to the attention of any supervisor any incident in which the employee believes Mayview's anti-discrimination policy has been violated. The handbook provides that employees are selected through a process requiring a written application, interview and an evaluation of references. Further, the handbook states that

each employee must "[r]ecognize the rights and dignity of [facility] [] residents and visitors," and those of fellow employees. Mem. in Support of Mot. for Summ. J. Ex. 6 [DE-17-7] at p. 5. Pledger received a copy of the employee handbook. Mem. in Support of Mot. for Summ. J. Ex. 6 [DE-17-7] at p. 45 (signed copy of Employee and Orientation checklist).

### 3. Employee benefits at Mayview

With respect to employee benefits, Mayview policy provides that part-time employees who average more than twenty hours per week, but less than thirty-five hours per week, are entitled to one half of the benefits accorded to full-time employees. Part-time employees accumulate vacation and sick leave at a lower rate than full-time employees. A part-time employee will lose benefits by averaging fewer than twenty hours per week for two consecutive calendar quarters. However, in the event a part-time employee falls below the requisite hours within a single quarter, Mayview will alert the employee of his or her shortfall and advise them to take the necessary steps to avoid disqualification.

### 4. Hiring at Mayview

As for the filling of vacant positions at Mayview, formal notices of job vacancies are not posted and the company considers both internal and external applicants for open positions. Generally, employees learn of job vacancies by word-of-mouth due to the small size of facility staff and will make their interest known to management and apply for the position. In the case of a vacancy created by a resignation, Haynes indicates the vacancy on a master schedule to which all nurses have access. According to Mayview policy, all persons interested in an open position, including current employees, must complete a job application and undergo an interview.

4

## B. Pledger's employment at Mayview

Pledger was interviewed by Haynes and Barlow, and on August 12, 1997, she was offered and accepted a part-time position as an RN and placed on the second shift. Mayview contends that Haynes and Barlow collectively decided to hire Pledger. Although she was hired as a part-time employee, Mayview contends that Pledger indicated that she might want to work full-time at some point in the future. Pledger, for her part, contends that when she was hired she asked to be a full-time on the first shift. Since her hiring, Pledger has remained employed at Mayview as a parti-time RN and has worked the second shift at all three stations throughout her employment.

### 1. Pledger's employment history

Beginning in approximately 2000 and occurring through 2007, Mayview received several complaints of Pledger's alleged rude and oftentimes threatening behavior toward staff, visitors and residents at the facility. Employees have complained that Pledger has berated other employees and has refused to assist her co-workers. Family members of residents have reported that Pledger ignored their inquiries regarding her care of residents and that she disregarded physician orders relating to the dispensing of medication to residents. Residents have complained to their family members that Pledger frightens them by her rude demeanor. On at least three occasions, Tomlinson has had to speak directly to family members because of issues related to Pledger's performance. Barlow has had to respond to complaints by residents as well. Tomlinson, Barlow and Haynes have each met with Pledger and asked her to improve the manner in which she interacts with co-workers, visitors and residents. In order to reduce the amount of time she spent interacting with family members Pledger was moved from Station Three to Station Four. Pledger does not dispute receiving these complaints, but insists that other nurses

also must have received complaints, although she does not know the number of complaints against other nurses. According to Mayview, Pledger has received significantly more complaints than any other nurse.

## 2. Pledger's work schedule

Accordingly to Mayview, on August 20, 2000, Pledger provided a hand-written note to Haynes stating that she would not be able to work Tuesday through Friday. Pledger indicated further that she could work Tuesday, Thursday and Friday or Wednesday, Thursday and Friday, and that ten days (over a four-week period) was enough part-time work for her. Mem. in Support of Mot. for Summ. J., Ex. 5 [DE-17-6] at p. 4. Mayview contends that Haynes followed up with Pledger, and confirmed that she was not available to work any Monday and was only available to work every other week. Mayview complied with these scheduling requests and Haynes scheduled Pledger to work only every other week and never on a Monday. Pledger voiced no objection to the scheduling modification.

Almost five years later, Pledger delivered a letter dated July 27, 2005, to Tomlinson requesting that she not be scheduled to work Tuesdays so that she could attend religious services associated with her Jehovah's Witness faith on Tuesday evenings from 7:30 p.m. to 9:00 p.m. Included in her letter to Tomlinson, Pledger indicated that she had made this same request to Mayview years prior, but had not been allowed off of work. Attached to Pledger's letter to Tomlinson were several hand-written notes to Haynes and Barlow dated prior to July 2005, containing requests that Pledger be allowed to take off of work on Tuesdays for religious reasons. Pledger said that she never presented these notes directly to Haynes and Barlow but that she may have "thumped[the notes] under [Haynes'] door." Mem. in Support of Mot. for Summ. J., Ex. 1

[DE-17-2] at p. 93 (Pledger Dep.). She does not know whether the letters were in fact received. For its part, Mayview states that it never received these notes and that Pledger's July 2005 letter was the first time it learned of Pledger's request for any accommodation related to her religion.

In response to Pledger's July 2005 letter, Haynes attempted to contact Pledger to clarify her understanding of Pledger's scheduling restrictions. In what Haynes describes as a terse and brief telephone conversation, Pledger told Haynes that she will not work Mondays or Tuesdays then promptly hung up the telephone. Haynes's note of the conversation indicates Haynes would follow Pledger's instructions and not schedule her to work Mondays or Tuesdays and continue scheduling Pledger to work every other week. Mem. in Support of Mot. for Summ. J., Ex. 6 [DE-17-7] at p. 41 (Haynes's August 4, 2005 memo to personnel file). Once again, Pledger did not object to the scheduling. According to Barlow, however, Pledger was mistakenly scheduled to work on Tuesday on two occasions. Pledger herself recalls one occasion in which she was scheduled to work on a Tuesday after 2005, but that she worked on the Tuesday without objection.

In a letter dated August 4, 2005 to Pledger, Tomlinson outlined Mayview's understanding of the restrictions Pledger had placed on her work schedule. According to Mayview, Pledger (1) could work only every other weekend, (2) could work every other week, (3) could not work any Monday or Tuesday, (4) only wished to work 10 days per four week schedule, and (5) she was requesting Tuesday off for religious purposes. Mem. in Support of Mot. for Summ. J. Ex. 5 [DE-17-6] at pp. 40-41. According to Mayview, irrespective of her request of religious accommodation, Pledger's other work restrictions was going to make it extremely difficult for Mayview to schedule Pledger sufficient hours to meet the required number to remain as a part-

time employee. Tomlinson advised Pledger that an accommodation of her schedule in accordance with her requests may result in her being scheduled for fewer than 20 hours per week. He asked her to prioritize her requests considering that the schedules of all the other nurses must be taken into account in making the nursing schedule. *Id.*

The letter was sent to Pledger via certified mail but was returned to Mayview unopened. Nonetheless, Tomlinson and Barlow met with Pledger to discuss the contents of the letter and asked her for more flexibility in her schedule. Pledger did not respond to the letter or provide Mayview with scheduling alternatives.

Although Pledger disputes that she ever requested Mondays off or to take off every other week, she testified that she did not respond nor address this "mistake" in the letter with Tomlinson. Instead, Pledger testified that she told Haynes that she was asking only to work every other weekend and to be off on Tuesdays and to work ten days per month. Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at pp. 105-06 (Pledger Dep.). According to Pledger, it was Haynes rather who unilaterally promised her Mondays and Tuesdays off of work. *Id.* Although eventually Pledger met with Tomlinson to discuss these work restrictions, she did not correct these misunderstandings because in her mind Mayview already knew she wanted Tuesdays off, although she cannot recall when she spoke to Haynes about it. She did not approach Barlow or Tomlinson after her discussion with Haynes.

### 3. Pledger's benefits

On April 24, 2006, Tomlinson sent a letter to Pledger summarizing an April 13, 2006, meeting he had with her and requesting that she clarify when she was available to work. Mem. in Support of Mot. for Summ. J., Ex. 5 [DE-17-6] at pp. 42-44 (April 24, 2006 Letter). In the letter,

Tomlinson explained that at the meeting he discussed the status of Pledger's benefits, and that for the April, May and June quarter of 2006, she would not receive part-time benefits because she failed to work a sufficient number of hours for two immediately preceding quarters. *Id.* Tomlinson highlighted his letter of August 4, 2005, and reiterated that the number of restrictions Pledger had placed on her work availability caused her to fall short of the number hours required to earn part-time benefits. *Id.* Tomlinson also reviewed Pledger's "work preferences" that had an additional impact on her schedule: Pledger preferred to work on Station Four, reluctantly worked on Station Three, and did not want to work on Station Two. *Id.*

Plaintiff admits that she did not voice any objection to this letter or otherwise follow-up with Tomlinson. She also admits that her benefits were not, in fact, reduced, but contends that Mayview applied her vacation hours in order to make sure she had enough hours to qualify for part-time benefits. Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at p. 107.

## C. Other positions at Mayview

Pledger claims she applied for a number of other positions while employed at Mayview.

### 1. Full-time nursing positions

Pledger testified that whenever a full-time nursing position became available at Mayview, she would apply for the position by sending notes to Haynes, which she would slide under Haynes's door, expressing her interest. Specifically, Pledger claims that sometime in 1999 she left a note for Haynes expressing her interest in a First Shift position on Hall Three. She was not selected for this position; rather, Judy Griffin, a white female was selected. She also asserts in her declaration that a number of first-shift positions have come open at Mayview, she applied for all of them, and was denied the positions.

9

Pledger claims she applied for a full-time position on Hall Two in August 2005 and Toni Veasey, a Caucasian, was selected. She claims she applied for the position again in 2005 or 2006, when Veasey left this position. Pledger said that she either submitted a written request to Haynes or to Barlow or Tomlinson, but a Caucasian was selected for the position. She identified four other white nurses who were selected over her for this position as the position subsequently became vacant. While Pledger admitted she did not know the ages of those selected, she said some appear younger.

### 2. Supervisory positions

In 2007, Pledger applied and was interviewed for a Staff Development Coordinator when Barbara Cobb resigned. She thinks she sent an application to Haynes and Barlow for the position. Ellen Jones, an African-American, was ultimately selected for the position. Pledger admits she does not know anything about Jones's qualifications for the position.

Pledger also claims that she applied in writing for a supervisor position on the First Shift on Hall Four in 2008. Although Pledger was interviewed for the position, Mayview selected Wanda Robinson for the position. Ms Robinson is an African American with fifteen years in this same position at another nursing facility. Pledger also claims she left a note for Haynes expressing her interest in a Temporary Relief Supervisor position on the First Shift, although Pledger is unsure of when the job vacancy occurred. Beth Mills, a white female, was selected for the position. Pledger claims she was denied this position again when Beth Mills subsequently left the position.

For its part, Mayview disputes that Pledger ever applied for these positions, with the exception of the positions for which she was interviewed.

### 3. Mayview's offer

In April 2006, Mayview offered Pledger a full-time nursing position. According to Pledger, Barlow offered Pledger a full-time nursing position on first shift. After Pledger had accepted the position, Barlow informed Pledger that Barlow had been mistaken and that the position was not on the first shift, but on the second shift. According to Barlow, however, the only available full-time position was on second shift and that Pledger initially accepted this position based on *Pledger's* mistaken belief it was for first shift. Decl. of Janice Barlow [DE-16] ¶ 6. After notified that the position was on second shift, Pledger declined the offer. *Id.* Pledger testified in her deposition that she declined to accept the second shift position because she wanted to be home with her daughter during that time period. Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at pp. 154-55 (Pledger Dep.). In her declaration testimony, however, Pledger states that she declined the offer because the work schedule interfered with her religious obligations. Pl.'s Mem., Ex. A [DE-21-2] at ¶ 7 (Pledger Decl.).

### D. Charges of Discrimination

On May 25, 2005, Pledger filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging race and religion discrimination. On August 2, 2005, the EEOC dismissed the charge and issued her a Notice of Right to Sue. On or about June 29, 2006, Pledger filed a second charge with the EEOC alleging that she had been unlawfully discriminated against on the basis of her race, age, sex and religion and that she had been the victim of discriminatory retaliation. The charge alleged discrimination occurring August 12, 1997 until June 29, 2006. On March 27, 2007, the EEOC dismissed the charge and issued Pledger a Notice of Right to Sue.

## III. STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## IV. DISCUSSION

Pledger alleges that she was discriminated against on the basis of her race, age and religion and that she was the victim of unlawful harassment and retaliation in violation of Title VII, § 1981 and the ADEA. Specifically, she claims that Mayview (1) failed to accommodate her religious beliefs; (2) failed to promote her to certain positions; (3) engaged in unlawful harassment, and (4) retaliated against her for engaging in protected activity.

### A. Applicable Legal Standards

In the Fourth Circuit, courts apply the same standards used in Title VII discrimination cases when evaluating claims arising under the ADEA and § 1981. *See Love-Lane v. Martin*,

355 F.3d 766, 786 (4th Cir. 2004) (stating that the elements required to establish a case under § 1981 and Title VII are the same); *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 238-41 (4th Cir.1982) (adopting the framework used in Title VII litigation for use in ADEA cases). Consequently, a review of applicable Title VII standards is necessary.

A plaintiff may establish a claim for unlawful discrimination under Title VII through two avenues of proof: (1) the burden-shifting pretext method, as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or (2) the mixed-motive method wherein the plaintiff demonstrates through direct or circumstantial evidence that, even if the reason given by the employer is true, the adverse action was also motivated by racial discrimination. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-86 (4th Cir.2004) (citing *McDonnell Douglas*, 411 U.S. at 807 and *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98-99 (2003)); *see also Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 317-19 (4th Cir.2005) (recognizing both theories in evaluating Title VII claims). In this case, Pledger has relied upon the burden-shifting pretext method.

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If a plaintiff establishes a prima facie case, an inference of discrimination is raised and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decision. *See id.* at 253. If the defendant carries its burden, the presumption of discrimination created by the prima facie case disappears from the case, and the plaintiff must then prove by a preponderance of the evidence that the defendant's

articulated reason was a pretext for unlawful discrimination. *See id.* at 253-55. Thus, the burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [plaintiff] has been the victim of intentional discrimination." *Id.* at 256. Accordingly, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). As *Reeves* makes clear, however, evidence of pretext combined with plaintiff's prima facie case, does not compel judgment for plaintiff: " '[i]t is not enough. . . to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination.' " *Reeves*, 530 U.S. at 147 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 520, 519 (1993))(alteration and emphasis in original).

A plaintiff may establish the falsity of an employer's explanation in either of two ways: first, an employee can offer evidence that the facts supporting the employer's articulated reason are not true, *see Evans*, 80 F.3d at 960, or second, an employee can establish that the employer's proffered reason, although supported by the facts, was not the actual reason for the adverse employment decision, as in the case of post hoc rationalization. *See Dennis v. Columbia Colleton, Med. Ctr., Inc.*, 290 F.3d 639, 648 n.4 (4th Cir. 2002). In either case, summary judgment will depend on "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148-49. With these applicable legal standards in mind, the court now turns to Pledger's claims for discrimination.

**A.     Pledger has failed to demonstrate a claim of failure to promote.**[1]

Pledger has alleged that she was discriminated against on the basis of her age, race and

religion when she was not promoted or selected for a number of positions at Mayview.[2]

Mayview has moved for summary judgment with respect to each of these positions.

To establish a prima facie case of discriminatory failure to promote, a plaintiff must

show: (1) she is a member of a protected group; (2) she applied for a position; (3) she was

qualified for the position; and (4) she was rejected from the position under circumstances giving

rise to an inference of unlawful discrimination. *Amirmokri v. Baltimore Gas & Elec. Co.*, 60

F.3d 1126, 1129 (4th Cir. 1995). In this case, it is undisputed that Pledger has satisfied the first

element of the prima facie case, in that she is African-American and a member of the Jehovah's

Witness faith. The parties dispute whether she has established the remaining elements.[3]

---

[1] In support of her disparate treatment and accommodation claims arising under Title VII and the ADEA, Pledger may not rely on acts of discrimination alleged to have occurred prior to December 24, 2005, more than 180 days prior to filing of her June 29, 2006 EEOC charge. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-15 (2002) (stating that discrete acts of discrimination such as failure to promote and retaliation alleged to have occurred prior to the charge filing period are barred and cannot form the basis for recovery). In support of her § 1981 claims, Pledger cannot rely on events alleged to have occurred before June 22, 2003, more than four years prior to her complaint. *See James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421 (4th Cir. 2004) (concluding that the four-year statute of limitations applies to claims based on conduct occurring after the formation of a contractual relationship)(citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004)).

[2] Pledger has not discussed age discrimination in her response, thereby limiting her argument on this cause of action to grounds of race and religious discrimination. *See Brand v. North Carolina Dept. of Crime Control and Public Safety*, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004)(determining that where a plaintiff fails to respond to a defendant's arguments regarding a discrimination claim, the plaintiff waives the claim).

[3] Pledger erroneously asserts that the parties do not dispute any of the first three elements.

## 1. Supervisor Position

Pledger testified that she applied for a supervisor position on Hall Four in 2008 when a vacancy occurred and that she was wrongfully denied the position. Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at p. 72 (Pledger Dep.). Although Mayview contends that Pledger did not apply for the position, Pledger has offered sworn testimony that she has applied, and thus she satisfies the second element of prima facie case. *See Gbenoba v. Montgomery County Dep't of Health & Human Serv.*, 209 F.Supp.2d 572, 576 (D. Md. 2002) (stating that plaintiff satisfied second element of prima facie showing of failure to promote claim by submitting sworn testimony indicating he applied for the position). In support of the third element of the prima facie case, however, Pledger offers nothing other than her own testimony that she was qualified for the supervisory position. *See Laber v. Harvey*, 438 F.3d 404, 431-32 (4th Cir. 2006)(citing *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (concluding that the plaintiff could not establish a prima facie case of discrimination where plaintiff did not "present any evidence that his education, experience or training qualified him for the job" other than "his conclusory assertions"). Additionally, at least with regard to her claim for race discrimination, Pledger was not rejected under circumstances giving rise to an inference of unlawful discrimination. The person selected for the position, Wanda Robinson, is African-American. *See also Langerman v. Thompson*, 155 F. Supp. 2d 490, 495 (D. Md. 2001) (holding that fourth element required showing that plaintiff "was rejected under circumstances giving rise to an inference of unlawful discrimination," and stating that "the fourth prong is most easily satisfied by showing that someone outside of the plaintiff's protected group ultimately was selected for the position"). Moreover, even with regard to her claim for religious discrimination, Pledger has

16

failed to proffer evidence establishing the fourth element of the prima facie case. Indeed, when asked whether she believed that this position was in fact denied to her on the basis of discrimination, Pledger responded in the negative, stating that she was simply "passed over" for the position. Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at p. 81 (Pledger dep.).

Even if Pledger had satisfied the elements of her prima facie case, she has failed to proffer evidence from which a jury could conclude that Mayview's reason for not promoting her was pretext. Supervisory staff are charged with being able to resolve complaints among the staff, family members and facility residents, and therefore must be able to get along with staff, residents and family members. According to Mayview, considering Pledger's demonstrated inability to get along with staff, residents and family members and her history of altercations with staff, Pledger does not possess these skills for a supervisor position. Pledger admits to her history of demonstrated acrimony with her co-workers and residents and their family members, and agrees that getting along with staff, and residents is an important component of the supervisory position. Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at pp. 81-82 (Pledger dep.). Yet, she contends that this is an insufficient reason to deny her this position. Rather, she contends that Mayview's philosophy, the source of which she does not identify, is that all employees should be allowed to advance, then, only after having promoted the employee, should the employer determine if the employee is in fact qualified for the position - in her case Mayview should have promoted her then wait and see if she continued her behavior. Pledger's reasoning does not cast doubt on the validity of Mayview's explanation for her rejection. Not only does Pledger's rationale make scant sense, but the constraints she would have the court place on employers is not required by Title VII.

17

Moreover, because Haynes was one of the same persons who hired Pledger, there is a "powerful inference" that Haynes' decision not to promote her was not motivated by discriminatory animus. *See Evans*, 80 F.3d at 959 (recognizing a "powerful inference" that employer's failure to promote plaintiff was not based on discriminatory motive because individual who failed to promote plaintiff was same individual who hired plaintiff). In addition, the racial make-up of Mayview's shift supervisory workforce, of whom three out of five supervisors are African or African American over the age of forty is evidence that Pledger is not the victim of intentional racial discrimination. *See* Decl. of Janice Barlow [DE-16] ¶2; *see McDonnell Douglas*, 411 U.S. at 805 ("Other evidence relevant to any showing of pretext includes facts as to the . . . petitioner's general policy and practice with respect to minority employment."). Consequently, Pledger has failed to demonstrate that Mayview's legitimate non-discriminatory reason for not selecting her for this position is pretext.

## 2. Full-Time Nursing Positions

Pledger alleges that beginning in March 2005, she applied for full-time nursing positions on the first shift as these positions became vacant. Pledger testified that she was qualified for each of these positions and that she applied to each of these positions by leaving a note with Haynes as the positions became vacant. In each instance Pledger asserts the positions were given to white non-Jehovah Witness females. Pledger testified that she was unsure of the ages of these individuals but "[j]ust by the way they look[ed]" she could tell they were younger than she. Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at p. 81 (Pledger dep.).

Pledger has failed to establish a prima facie case of unlawful discrimination with respect

18

to her rejection to these positions. Clearly, Pledger as an African-America, and as a member of the Jehovah's Witness faith, is a member of a protected group. She also satisfies the second element of her showing by testifying she applied for the position. *See Gbenoba*, 209 F. Supp. 2d at 576. Pledger, however, cannot demonstrate that she is qualified for a full-time position and has presented no argument other than conclusory statements that she is in fact qualified.

Indeed, the record shows instead that the several restrictions she placed on her work schedule, irrespective of the one restriction related to her religious accommodation request, disqualified her from full-time employment. She does not address this in her response. Pledger was in fact advised by Tomlinson that her unilateral work restrictions jeopardized her viability as a part-time employee as it was difficult to schedule her pursuant to her instructions as well as all other Mayview nurses. Second, also not challenged, is Pledger's frequent altercations with staff, residents and family members. Consequently, as to the third element of her prima facie case, there is undisputed evidence in the record of what courts have typically considered job disqualifiers, such as deficient job performance. *See, e.g.*, *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001) (citing *Montgomery v. John Deere & Co.*, 169 F.3d 556, 559-60 (8th Cir.1999) for the example of where a plaintiff's prima facie case was, at best, weak where evidence showed the plaintiff's job performance was deficient). There is no dispute that Pledger has a demonstrated history of being disruptive to both staff members and facility residents and their family members as well as failing to provide timely medical care to residents. Pledger does not dispute these findings, nor does she contest that she has in fact received the most complaints than any other Mayview staff member. This demonstrated behavior is contrary to Mayview policy and job performance criteria and Pledger has been counseled by Tomlinson, Barlow and

Haynes on a number of occasions. For this reason Pledger has failed to demonstrate that she is in fact qualified for the position.

Finally, if Pledger were able to establish a prima facie case, she cannot demonstrate pretext. The record shows that Mayview did offer to place her in a full-time nursing position in April 2006. Pledger only responds by summarily asserting that "the facts clearly infer that the defendant had a discriminatory motive when it failed to hire plaintiff to a full-time first shift position when numerous positions became open over a number of *years*." Pl.'s Mem. [DE-21] at p. 12 (emphasis in original). She tries to focus on Mayview's practice of not posting vacancy announcements and what she perceives to be an inadequate manner of communicating job openings. *Id.* at 3. This argument, however, is based on supposition and innuendo and consequently she fails to cast doubt on the reason for her non-selection.

### 3. Temporary Relief Supervisor

Pledger also claims that she was denied the position as a Temporary Relief Supervisor when Allison Kinnarney, Caucasian, aged thirty-five, was selected for the position. The Temporary Relief Supervisor position is responsible for supervising nurses at times when the regular shift supervisor and relief supervisor are absent. Responsibilities include the ability to get along with staff residents and family members. Haynes and Barlow testified that Pledger was not qualified for a supervisor position because of her demonstrated inability to get along with others.

As an initial matter, the facts show that Kinnarney was selected for this position on June 2, 2003, thereby removing the claim beyond the applicable limitations period. Decl. of Janice

20

Barlow [DE-16] ¶¶7-8; Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at p. 153 (Pledger dep.). Pledger's claim as to this position is therefore time-barred.

### 3. Staff Development Coordinator

Pledger also contends that she was discriminatorily denied a promotion to the position of Staff Development Coordinator. Barlow and Haynes interviewed Pledger and considered her for the position. However, Pledger has failed to show that she was qualified for this position and, with regard to race, that it was denied to her under circumstances raising an inference of unlawful discrimination. Pledger maintains she "considered herself to be an extremely qualified nurse, as well as a good employee." Pl.'s Mem. [DE-21] at p. 6. Nonetheless, it is well established that a plaintiff's "own naked opinion, without more, is not enough to establish a prima facie case of discrimination." *Evans*, 80 F.3d at 959 (quoting *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988). Moreover, the individual selected for the position, Ellen Jones, is African-American and was over the age of forty at the time she was selected. Decl. of Janice Barlow [DE-16] ¶2. At the time she was hired by Mayview, Jones had more than sixteen years experience as a Staff Development Coordinator at nursing facility. *Id.*; Mem. in Support of Mot. for Summ. J., Ex. 2 [DE-17-3] at p. 50 (Tomlinson Dep.); Ex. 3 [DE-17-4] at pp. 32-33 (Barlow Dep.). Although Pledger had one month experience as a Staff Development Coordinator at another facility, she was not selected because Jones was considered the better candidate based on her length of experience. Mot. for Summ. J., Ex. 3 [DE-17-4] at pp. 32-33 (Barlow Dep.). Jones's considerable experience in the same position sought to be filled by Mayview and the fact that she is of the same race and over the age of forty, precludes Pledger's claim that she was not selected under circumstances giving rise to an inference of discrimination.

Moreover, even assuming Pledger can establish a prima facie case of either race or religious discrimination, she has not proffered evidence which would allow a jury to conclude that Mayview's reason for not promoting her to this position is pretext. In her response, Pledger takes issue with the fact that Jones was hired externally, and states that "it had always been Mayview's policy to fill positions internally until [she] applied for the Staff Development Coordinator position." Pl.'s Mem. [DE-21] at 10. This statement, with no citation to the record, is in fact not an accurate statement of the record. Haynes testified that she *generally* tried to fill positions from within before hiring an outside applicant. Pl.'s Mem., Ex. B [DE-21-3] at p. 16 (Dep. of Haynes). Yet, even if accurate, the statement is not as compelling as urged by Pledger. Merely because Mayview would prefer to hire from a pool of its current employees, this would not preclude them hiring the best candidate who happens to be employed elsewhere.

Pledger contends, however, that there was no significant communication for job vacancies, and this casts doubts upon Mayview's reasons for not hiring her. Haynes testified, however, that if someone resigns, she writes "resigned" on the master schedule to which all nurses have access. Pl.'s Mem., Ex. B [DE-21-3] at p. 15 (Dep. of Haynes). This court cannot perceive how this testimony casts doubt on the reasons offered by Mayview for Pledger's rejection. Finally, Pledger herself testified that she does not believe the position was denied to her as the result of an unlawful discriminatory motive; rather she states that the position was "simply denied" to her. Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at p. 81 (Pledger dep.). Based on the record, Pledger neither has proffered evidence to establish a prima facie case of discrimination for not being promoted to this position, nor has she proffered sufficient evidence of pretext.

### 4. Assistant Director of Nursing

Finally, Pledger also claims that she applied for the position of Assistant Director of Nursing but was not promoted. She is unable, however, to show a prima facie case of discrimination with respect to this position: the undisputed evidence is that this position was filled on April 24, 2006, and that Pledger did not apply for this position until May. *See* Mem. in Support of Mot. for Summ. J., Ex. 2 [DE-17-3] at pp. 48, 51 (Tomlinson dep.); Decl. of Janice Barlow [DE-16] ¶10 (stating that Mayview filled position on April 24, 2006); Pledger Decl.¶8 ("On May 5, 2006, I applied for the position of Assistant Nursing Director."). Because the position was already filled by the time Pledger applied for it she is unable to demonstrate a prima facie case of discrimination as to this position. Consequently, for all the foregoing reasons, Mayview's Motion for Summary Judgment [DE-15] is ALLOWED as to Pledger's claims for discriminatory failure to promote.

### B. Pledger has failed to demonstrate a claim of religious accommodation.

In her Complaint, Pledger suggests that Mayview discriminated against her on the basis of her religion by failing to accommodate her request that she not be scheduled for work Tuesdays so that she may attend religious services. Compl. [DE-1] at p. 4. Mayview moves for summary judgment on this possible religious accommodation claim. In her response brief, Pledger concedes that her request not to be scheduled to work Tuesdays for religious reasons was in fact accommodated by Mayview. Pl.'s Mem. [DE-21] at p. 15. Pledger asserts instead that Mayview's accommodation of her religious observation came "with a price" and that as a result she was denied opportunities of promotion within Mayview. *Id.*

23

To the extent that Pledger argues she has a disparate treatment claim based on religious discrimination for failure to promote, her claim fails, for the reasons the court already has discussed above. To the extent that Pledger alleges a failure to accommodate claim, it also fails.

Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). The term " 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Therefore, an employer has a "statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977). To establish a prima facie case of an employer's failure to accommodate an employee's religious observation, a plaintiff must demonstrate that (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and that (3) he or she was disciplined for failure to comply with the conflicting employment requirement. *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir.1996) (citation omitted). For purposes of the court's consideration of its motion for summary judgment, Mayview does not dispute the first element of Pledger's prima facie showing. Pledger is unable, however, to establish the remaining elements of a prima facie case of Mayview's failure to accommodate her religious beliefs.

First, the record demonstrates that Pledger did not inform Mayview of her request for an

24

accommodation until July 2005 when she included her request in a letter to Tomlinson–a request which Pledger acknowledges was accommodated. While Pledger contends that she had made a request for religious accommodation to Mayview in 1998, and to no avail, there is no evidence that Mayview ever received this request. Pledger in fact cannot recall communicating this request to Mayview or that Mayview actually received her request. Pledger testified she spoke to Haynes and advised her of her need for a religious accommodation but does not recall when this occurred. Moreover, Pledger's handwritten note to Haynes in January 2000 in which she indicated she was available to work Tuesdays belies her contention of having placed Mayview on earlier notice of a need for an accommodation. Mayview's non-compliance with a request of which it was unaware cannot be the basis of a claim of refusal to accommodate one's religious beliefs in the workplace.

Second, even if Pledger were found to have notified Mayview in 1998 as she contends, she continued to work Tuesdays without objection. While the record shows that Pledger was scheduled inadvertently to work on Tuesdays by Mayview at least on two occasions after 2005, this fact is does not in and of itself save Pledger's claim. Rather, by agreeing to work on Tuesdays, Pledger in fact avoided any adverse employment action resulting from her religious beliefs and her claim must fail. *See Isse v. American Univ.*, 540 F.Supp 2d 9, 29 (D.D.C. 2008) (stating that plaintiff failed to establish third element of prima facie case because by agreeing to work in non-observance of religious beliefs plaintiff avoids suffering any adverse employment consequences as a result of religious beliefs); *Stone v. West*, 133 F.Supp.2d 972, 985-86 (E.D. Mich. 2001) (same). Accordingly, Mayview's motion for summary judgment is ALLOWED as to Pledger's religious discrimination/accommodation claim.

**C.    Pledger has failed to demonstrate a claim of unlawful retaliation.**

Pledger alleges that Mayview retaliated against her for filing an EEOC charge in May 2005. Specifically, Pledger claims that after August 2005, Mayview began to schedule her to work fewer than twenty hours per week, which in turn forced her to use her vacation and sick leave time in order to bring her hours up to remain a part-time employee. Pledger also asserts that she was retaliated against when denied full-time nursing positions, the Temporary Relief Supervisor position and the Hall Four Supervisor. She also contends that she was denied training opportunities necessary for job advancement, including training for the position of Temporary Relief Supervisor sometime in August 2005. Finally, she claims that she was retaliated against when she refused to perform work which she felt violated the North Carolina Nurse Practice Act.

In order to establish a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in a protected activity; (2) that an adverse employment action was taken against her; and (3) that there is a causal link between the protected activity and the adverse employment action. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 258 (4th Cir.1998). In order to establish the causation element of her prima facie case, a plaintiff must establish that an adverse employment action was taken *because* the plaintiff engaged in a protected activity. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998). Courts have held that a temporal proximity alone "may satisf[y] the less onerous burden of making a prime facie case of causality." *Williams v. Cerebronics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989). However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action uniformily hold that the temporal proximity

must be 'very close.' " *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam)(quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001); *see also Pascual v. Lowe's Home Ctrs., Inc.*, 193 Fed. Appx. 229, 233 (4th Cir. 2006) (three to four months insufficient); *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (thirteen months insufficient). While the employer's knowledge that the plaintiff engaged in a protected activity is essential to establish causation, knowledge alone is insufficient to establish a causal connection between the protected activity and adverse employment action. *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). To find causation otherwise would ask the court to engage in speculation and conjecture. *See Gibson v. Old Town Trolley Tours of Washington, D.C.*, 160 F.3d 177, 181-82 (4th Cir. 1998) (citing *Lovelace v. Sherwin Williams Co.*, 681 F2d 230, 241 (4th Cir. 1982)).

It is not disputed that Pledger engaged in a protected activity by filing EEOC charges in May 2005. With respect to the other elements of Pledger's prima facie case however, she has failed raise an inference of retaliation. Furthermore, Pledger has failed to proffer sufficient evidence that the legitimate non-discriminatory reasons proffered by Mayview for the various employment actions are pretextual.

### 1. Loss of Benefits/Hours

With respect to her claim that her hours have been reduced and she has experienced a loss of benefits, Pledger has failed to show she suffered an adverse employment action and that there is a causal link to her protected activity. Pledger testified that she received a letter from Mayview telling her that her status as a part-time employee would be dropped because of

insufficient hours worked. Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at pp. 180-81. Pledger testified further that she thinks "for a period of time she did not get part-time hours", but she does not know when this occurred. *Id.* at p. 181. Although she believes that she has experienced a loss in benefits, she cannot recall when this occurred or how long she lost her benefits. *Id.* at pp. 181, 184.[4]

Pledger's failure to show when the adverse employment action occurred is fatal to her claim because it precludes her from showing the necessary causal connection between the protected activity and adverse employment action. Indeed, the record shows that Pledger never lost entitlement to part-time benefits, which is fatal to her claim.

Moreover, even if Pledger were found to have experienced a reduction in her benefits, she has failed to proffer sufficient evidence of pretext. Pledger herself testified that she understands that according to Mayview policy, vacation and sick time are considered "hours-worked" and may be allotted to supplement one's work schedule when their hours fall below the necessary number required to retain employment status. Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at pp. 107 (Pledger dep.). This is in fact the very set of circumstances that Tomlinson had advised her of in his letter of August 2005 in response to her several scheduling requests in an effort to have her be more flexible in her work restrictions so that she could be

---

[4] The court notes, however, that although Pledger claims that she received a letter advising her that her status as a part-time employee would end because she had not been working sufficient hours, she admits that her employment did in fact not end. In fact, in her deposition she indicated that she always had sufficient hours to remain employed. *Id.* at p. 112. Tomlinson also has offered unchallenged testimony that her compensation was not decreased save for an annual modification to the salary differential that was applied to all nurses. Mem. in Support of Mot. for Summ. J., Ex. 2 [DE-17-3] at p. 56 (Tomlinson dep.).

scheduled for more work. In sum, Pledger has failed to cast doubt on this rationale with respect

to any adverse employment action she may have experienced with respect to benefits, and any

retaliation claim based on reduction of benefits fails.

### 2. Full-Time and Supervisor Positions

With respect to the supervisory positions, Pledger has failed to demonstrate a causal link

between these actions and her protected activity. First, with respect to the Temporary Relief

Supervisor position, the evidence is clear that the only Temporary Relief Supervisor position in

which she was interested became available in March 2005. Decl. of Janice Barlow [DE-16] ¶8; .

Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at pp.153, 166 (Pledger Dep.). This

position cannot be a basis of a retaliation claim not only because it is beyond the applicable

limitations period, but because it pre-dates her first EEOC charge of May 2005. *See Gibson*, 160

F.3d at 181 (stating that retaliatory action "could not have possibly been motivated by an EEOC

complaint not yet filed."). Next, with respect to the Hall Four Supervisor position vacated by

Sharon Milmoe, Pledger has failed to allege with required specificity when she was denied this

position, speculating that it occurred before August 2005, and thereby failing to demonstrate the

temporal nexus between the protected activity and adverse employment decision. *See id. at* 181-

82 (cautioning that court will not engage in speculation as to employer's motive).

Even if Pledger could establish a prima facie case of retaliation with regard to the

supervisor positions, she has failed to proffer sufficient evidence to rebut Mayview's proffered

non-discriminatory reason offered by Mayview for her rejections. Rather, Mayview has set forth

compelling evidence that Pledger's history of not getting along with staff and residents

disqualifies her as a viable candidate for a supervisor. *See Laber*, 438 F.3d at 432 (concluding that the plaintiff's failure to show qualifications for position to which he applied precluded showing of pretext for retaliation); *Evans*, 80 F.3d at 960 ("[E]mployee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision."). Furthermore, with regard to the Temporary Relief Supervisor position which became open in 2008, Pledger herself admitted that she was not discriminated against but simply "passed over." Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at p. 81(Pledger Dep.) In sum, Pledger has failed to show that Mayview's proffered reasons for not promoting her are unworthy of credence.

With regard to the full-time nursing positions which Pledger contends were denied to her on the basis of retaliation, she does not state when she applied for and was denied these positions. In her response, she contends that she was rejected for these positions beginning in March 2005. Pl.'s Mem. [DE-21] at p. 2. To the extent she argues that actions predating her charge can be evidence of retaliation must be dismissed. Moreover, because she has failed to indicate any other time of an adverse action, she fails to proffer sufficient evidence showing the necessary causality between her protected activity and action by the employer. Consequently, any retaliation claim based on the failure to promote fails.

### 3. Training Opportunities

Pledger also contends that she was retaliated against on the basis of being denied training opportunities. In her deposition she focuses on the Temporary Relief Supervisor position, and indicated that being denied training for this position was retaliation. Pledger testified that she

30

had in fact received part of this training while other had completed it. However, the fact that she

may have been denied training has not worked to her detriment as the last Temporary Relief

Supervisor position in which she expressed interest was in March 2005, prior to her EEOC

charge and her alleged denial of training opportunities for this position. Moreover, there is no

evidence that she has been denied other training, which she in fact admits to receiving. Mem. in

Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at p. 180 (admitting that she attends in-service

training meetings at Mayview). Finally, the record establishes that the reason she was not

selected for supervisory positions was her poor attitude, namely the manner in which she

interacted with her co-workers, residents and their family members. Mayview offered no training

*to anyone* on the manner in which staff should interact with one another. Pl.'s Mem., Ex. B [DE-

21-3] at p. 38 (Haynes Dep.)("We don't have courses in how to talk to people. I guess that's

what–you know, we do offer continuing education on different subjects a lot . . . . But they are

more, again, more technical programs regarding patient care issues."). In short, training in

personal communication skills, which are necessary to be a supervisor, is not offered by

Mayview and cannot therefore be denied Pledger, much less with a retaliatory motive.

Accordingly, to the extent Pledger's retaliation claim is based upon denial of training, it fails.

### 4. Violation of Nurse Practice Act

Pledger further asserts that she was retaliated against when she was disciplined for

refusing to perform work that she believed violated the North Carolina Nurse Practice Act and

was not ethical. Specifically, she states that on one occasion while working at Mayview, she was

asked by the Relief Supervisor to assist the nursing staff Whitaker Glen, another nursing facility.

Pledger refused on the grounds that it was her belief that doing so was unethical, in violation of

31

the Nurse Practice Act and was not practical. Mem. in Support of Mot. for Summ. J., Ex. 1 [DE-17-2] at pp. 184-85 (Pledger Dep.). This claim fails because there is no *evidence* that Pledger was disciplined, or suffered any other adverse employment action, for refusing to go to Whitaker Glen. *Id.* at pp. 186-87 (admitting that no disciplinary action was taken against her). Moreover, any alleged retaliation would not be in response to protected activity cognizable under Title VII. *See* 42 U.S.C. § 2000e-3(a) (An employee who "oppose[s] any practice made an unlawful employment practice by [Title VII]" has engaged in protected activity"); *see Kubicko v. Ogden Logistics Servs.*,181 F.3d 544, 551 (4th Cir.1999) (noting that "protected activities" may consist of either "opposition" or "participation" activities). For the foregoing reasons, Mayview's motion for summary judgment is ALLOWED as to Pledger's retaliation claims.

**D.      Pledger has failed to demonstrate a claim of unlawful harassment.**

In her complaint, Pledger alleges that she was subjected to offensive and disparaging comments of a racial and religious nature. Compl. [DE-1] at p. 4. However, in response to Mayview's motion for summary judgment, Pledger has not briefed this issue or presented any rebuttal argument. Rather in her response, Pledger focuses only upon her claims of religious accommodation, failure to promote and retaliation. Accordingly, the court deems this theory of discrimination waived. *See Brand v. North Carolina Dept. of Crime Control and Public Safety*, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004) (noting that where a plaintiff fails to respond to a defendant's arguments regarding a hostile work environment claim, plaintiff concedes he has not stated a claim).

Even if the court were to construe the two sentences on page seven[5] of her response brief as replying to Mayview's motion for summary judgment, Pledger has failed to come forward with evidence that establishes that was subjected to "severe and pervasive" harassment. *See Harris v. Foklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment") (internal citations and quotations omitted). Without such evidence, any claim for hostile work environment must fail, and Mayview's motion for summary judgment is ALLOWED as to this claim.

**E.  Pledger may not create a triable issue on the unsupported and contradictory statements contained in her declaration.**

Finally, the court notes that Pledger, in her response to Mayview's motion for summary judgment, proffers a declaration detailing the different ways Mayview allegedly discriminated and retaliated against her. An affidavit in opposition to a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial;" the party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading. FED. R. CIV. P. 56(e). Rule 56(e) specifically requires that affidavits submitted on summary judgment contain admissible evidence and be based on personal knowledge. *Evans*, 80 F.3d at 962. Therefore, hearsay, conclusory statements, and "self-serving opinions without objective corroboration" will not be considered by the court. *Id.* Furthermore, "[i]t is well

---

[5] Pledger states: "Finally, Pledger contends that she was subjected to offensive and disparaging comments of a racial and religious nature. Barlow frequently referred to her as "poor, black Peggy" when she complained to her about work place issues." Pl.'s Mem. [DE-21] at p. 7.

recognized that a plaintiff may not avoid summary judgment by submitting an affidavit that conflicts with earlier deposition testimony." *Alba v. Merrill Lynch & Co.*, 198 Fed. Appx. 288, 300 (4th Cir. 2006); *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of facts is to determine which of the two conflicting versions of the plaintiff's testimony is correct."). Indeed, "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Barwick*, 736 F.2d at 960 (internal quotation omitted).

Pledger's declaration contains several unsubstantiated and conclusory allegations that contradict the evidence in the record, including her own sworn deposition testimony. Consequently, she cannot create a genuine issue of material fact as to any of her claims based on the allegations in the declaration.

For example, in support of her retaliation claim, Pledger asserts that Mayview promised to allow her to participate in the employee float pool, yet rescinded this promise after she filed her first EEOC charge in May 2005 and based on her refusal to assist at another nursing facility. Pl.'s Mem. [DE-21] at p. 4; Ex. A at ¶¶ 10, 21 (Pledger Decl.). These are new allegations of discrimination. When asked to describe all the ways in which she had been retaliated against, Pledger did not testify as to the alleged denial of her participation the float pool. She testified in fact that <u>no disciplinary action</u> was taken against her for her refusal to attend to residents of another nursing facility. In fact, her declaration testimony contradicts that of her deposition wherein Pledger testified that she participated in voluntary shift work outside of her regular

34

schedule and that there were occasions when she was called upon to volunteer but she declined though she was able. Moreover on several occasions Mayview contacted Pledger to inquire whether she wished to participate in the float pool, yet she did not respond. Mem. in Support of Mot. for Summ. J., Ex. 6 [DE-17-7] at p. 42.

Next, in her declaration, she describes briefly a meeting she had with Tomlinson on April 13, 2006, in which she advised him that since August 2005, she had been working full-time hours. Pl.'s Mem., Ex. A [DE-21-2] at ¶ 5 (Pledger Decl.). This assertion runs counter to her position that she was **not** being schedule to work sufficient hours, which is the basis for much of her claims against Mayview. This stark contradiction is left unexplained by Pledger.

Pledger also has made inconsistent and logically unsustainable assertions in her response and declaration relative to Mayview's offer of full-time employment. Pledger states that on April 18, 2006, Haynes offered her a full-time position on first shift, then changed the offer to the second shift, a position she could not accept because, according to Pledger, it conflicted with the demands of her religious observance. Pl.'s Mem., Ex. A [DE-21-2] ¶ 7. According to Pledger this was the first time Mayview had ever offered her a position of full-time employment. *Id.* However, she contradicts this testimony three paragraphs later within her declaration when she asserts Mayview had in fact promised her an earlier job to comport with her religious obligation yet rescinded it after she filed an EEOC charge. *Id.* ¶10. In addition, her reason for not accepting the full-time position on second shift is suspect as she testified in her deposition that she declined the position because she wanted to spend time with her daughter, unrelated to religious observance. Pl.'s Mem., Ex. A [DE-21-2] at p. 154 (Pledger Dep.). Pledger's contradictory and conclusory allegations in the declaration cannot save her claims, and Mayview's motion for

35

summary judgment is ALLOWED.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [DE-15] is ALLOWED. The Joint Motion to Continue [DE-40] is DENIED as moot. The Clerk of Court is DIRECTED to close the case.

SO ORDERED. This the _14_ day of April, 2009.

James C. Fox
Senior United States District Judge